| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: February 28, 2023<br>CASE NUMBER: 2023CV117<br><br>FEB 28 2023<br><br>DENVER, COLORADO<br>COUNTER CLERK |
| DAVID PEREZ, an individual<br><br>    Plaintiff,<br><br>v.<br><br>CITY AND COUNTY OF DENVER<br>  DENVER FIRE DEPARTMENT<br>  DEPARTMENT OF PUBLIC SAFETY<br>  DEPARTMENT OF RISK MANAGEMENT<br><br> and<br><br>DENVER FIREFIGHTERS IAFF LOCAL 858<br><br>    Defendants, | ▲ COURT USE ONLY ▲ |
| *Attorneys for Plaintiffs:*<br><br>Pro-Se Plaintiff, David Perez<br>619 12th St, #348<br>Golden, CO 80401<br>Tel: 303.433.2702<br>Email: dperez@1203media.com | Case Number:<br>23CV117<br>Div.:<br>424 |
| COMPLAINT AND JURY DEMAND | |

23CV117-1 CB
23CV117-2
(9m-y)

**EXHIBIT A-1**

Mr. David Perez (Plaintiff), Pro-Se respectfully alleges for his Complaint and Jury Demand against the City and County of Denver "the City", and its departments, the Denver Fire Department "the DFD", the Department of Public Safety, and the Department of Risk Management all together referred to collectively herein "the City and its Departments" and the Denver Firefighters IAFF Local 858 "Local 858", all referred to collectively herein as "the Defendants."

STATEMENT OF THE CASE

1.      This case arises out Federal and State laws pertaining to the American Disability Act (ADA), Colorado Workers Compensation, Civil Conspiracy and Breach of Contract and violation of those laws between the Plaintiff and the Defendants respectively.  Plaintiff suffered a crushing hand injury while mitigating a house fire while employed as a firefighter with the DFD.  The DFD would intentionally violate the Plaintiff's work restriction and exacerbating the injury to his hand with malicious intent.  The City and its Departments use a well-documented, witnessed Line-of-Duty (LOD) injury against the plaintiff to delay then deny medical treatment and the use that injury to find the Plaintiff unfit for duty, placing the Plaintiff on Leave Without Pay (LWOP) and ultimately terminating the Plaintiffs employment without due process.

2.      After the City's Department of Risk Management accepted liability of the Plaintiff's LOD injury, the Department of Risk Management would then delay the Plaintiffs medical treatment for nearly 3 months and later deny necessary medical treatment for his LOD injury, over 220 days after the Plaintiffs initial injury; an injury which the City's Department of Risk Management initial approved and admit claim as a LOD injury.  When the Department of Risk Management denied the Plaintiffs' Workers Compensation claim, together, the City and its Departments and the Local 858 would conspire and use the Plaintiffs medical conditions to place him on LWOP.  For the last 3 months of the Plaintiffs time employed with the City, the City would keep the Plaintiff on LWOP, denying transfer requests to work positions he could do, denying request for assistance and guidance

2

on his employment status and medical condition, actions which the DFD has done in past for other injured firefighters. The City would deny further medical treatment only to use the Plaintiffs injury as grounds for terminating his employment at midnight of 3 Mar 2020. The City's Department of Rick Management would continue its deceptive practices and delay mediation and continue to deny medical evaluations and treatment for over two years after the Plaintiff was terminated from his position and over 3 years from the initial LOD injury.

     3.     Prior to the termination of the Plaintiff by the City, Plaintiff reached out to the Local 858 requesting guidance and representation. The Plaintiff wanted to file a grievance on multiple accounts for the unfair labor acts conducted by the City and its Departments in violating the DFD and the City's own employment policies and procedures. The Local 858 denied all requests of support to the Plaintiff in filing a grievance and representing the Plaintiff with his claims against the City and its Departments. The Local 858 failed their duty of fair representation on behalf of the Plaintiff as a due paying member.

     4.     The Plaintiff had been a due paying member to the Local 858 since the beginning of his employment as a Denver Fire Fighter on 1 Dec 2006. As a due paying member, contractually the Local 858 owes a duty of fair representation to the Plaintiff and all the employees it represents when pursuing a worker's grievance, which the plaintiff was denied. The plaintiff brought these issues to the Local 858 on several occasions prior to his termination by the City. All request for representation and support from the Union for the Plaintiffs to further investigate the unlawful actions taken by the City and its Departments were ignored or denied.

## NATURE OF THE ACTION

     5.     This employment action against the City and its Department and the Local 858 seeks to enforce rights and remedies guaranteed by laws protecting the employment rights of the Plaintiff found under: Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §12101 et seq.

("ADA"); Colo Rev. Stat § 8-3-104 et seq, Labor Peace Act; Colo. Rev. Stat. § 8-3-108 et seq,

Employment Contracts; Colo Rev. Stat § 8-40-102 et seq, Department of Labor Division, Workers'

Compensation: Colo Rev Stat. § 10-3-1116(1) et seq, Insurance Contracts; Colo. Rev Stat. § 18-2-

201 et seq, Civil Conspiracy and to provide relief to Plaintiff, who has been adversely affected by the

Defendant's violation of such laws protecting the Plaintiff as an employee of the State of Colorado.

      6.     Plaintiff is currently, and at all times relevant to this suit, a resident of the State of

Colorado.

      7.     Defendant, the City and its Departments are headquartered in Denver Colorado. The

DFD employs over 1,000 paid firefighters and is governed under the City and County of Denver.

The Department of Public Safety, and the Department of Risk Management are also governed under

the City and County of Denver. The City and County of Denver has over 11,000 paid employees

serving all those that visit, conduct business, or resides in the City of Denver Colorado.

      8.     Defendant, Local 858 is headquarter in Denver Colorado. Local 858 is a union body

representing over 1,000 paid firefighters employed with the City and the DFD

      9.     Plaintiff incorporates by reference the above paragraphs herein as though set forth in

full.

JURISDICTION AND VENUE

      10.    This Court has jurisdiction over the Defendants because the Plaintiff's employment

history or association with the Defendants took place in the State of Colorado, and the City and

County of Denver, which the Defendants will consent to the jurisdiction of any court within the

United States.

      11.    This Court has jurisdiction over this action as a court of general jurisdiction pursuant

to Colo. Const. Art. VI § 9 and pursuant to C.R.C.P. 57, and the Colorado Uniform Declaratory

Judgments Law, C.R.S. § 13-51-101, et seq., under which Plaintiff is entitled to seek a declaration of

4

the Plaintiff's obligations under the contract of employment and insurance issued to Plaintiff the City and obligations under the union contract of representation by the Local 858.

    12.    Venue is appropriate in this Court pursuant to C.R.C.P. 98(c).

FACTUAL ALLEGATIONS

    13.    Plaintiff was a dedicated firefighter with the DFD for over 13 years and represented the department in the most honorable manner. While serving as a firefighter with the DFD, Plaintiff received multiple awards and recognition for his community service. He helped organize multiple events to raise over $10,000 for members of the DFD and their family members which include sending a DFD members son to artistic camp, raised monies to support the spouse of a DFD firefighter who was diagnosed with cancer as well as raising monies to support a DFD member who himself had cancer. Plaintiff spent countless hours providing fire safety classes to local public schools on his own time and taking part in public events representing the DFD and the City in an honorable manner. Plaintiff dedicated countless time and resources and donated hundreds if not thousands of dollars of his own personal money to support DFD efforts and charities which includes but not limited, the Denver Fire Museum, Friends of the DFD, the Denver Burn Foundation and sponsoring and supporting local families in need throughout his employment with the City as a Denver Firefighter.

    14.    Plaintiff also founded and chaired the Denver Firefighters Veterans Initiative (DFVI), a non-profit organization which provided support and tutoring to veterans for entrance, promotion, and mentoring within the public safety career field. The mission of the DFVI was to provide support not only to veterans in public service, but to all veterans and their families by creating joint affiliations with other veterans' organizations and their supporters, to ensure veterans are aware of all the resources available to them.

15.     Plaintiff is also a highly decorated veteran of the United States Marine Corps and has received numerous awards and citations to include but not limited to, 1 Navy Marine Corps Commendation Medal, 3 Navy Marine Corps Achievement Medal (1 with a Combat "V" for Valor), 1 Combat Action Ribbon, 1 Presidential Unit Citation, 2 Marine Corps Good Conduct Medals, 2 Iraqi Campaign Medals, 1 Global War On Terrorism Expeditionary Medal, 1 Outstanding Volunteer Service Medal, 3 Sea Service Deployment Ribbon, 1 Certificate of Commendation, 2  Letters of Appreciation and 2 Meritorious Mast.

16.     During his 15 years of active and reserve military service in the United States Marine Corps, Plaintiff served two separate tours on active duty from June 1994 to June 1998 and again from October 2001 to August 2005 and served in the Marine Corps Reserve from May 2013 to Dec 2017.  During his second tour on active duty, Plaintiff served two combat deployments to Iraq during Operation Iraqi Freedom during the initial push into Iraq in 2003 and again supporting combat operation in the Anbar Province based outside of Fallujah, Iraq in 2004.

17.     Plaintiff has been classified as permanently disabled through the Fire & Police Pension Association of Colorado (FPPA) and is a disabled Veteran of the United States Military.

18.     While fighting a house fire on 13 Mar 2019, Plaintiff sustained a witnessed, debilitating hand injury, when his hand was smashed after another crew ignored the Plaintiff's direction to hold off on breaching a door.  The Plaintiff's hand was smashed in the efforts in this process from the use of a 10lb sledgehammer.

19.     Plaintiff reported this injury to his immediate supervisor after his crew returned to the firehouse.  Plaintiff took appropriate actions to report this LOD injury per the DFD and the City's Work-Related injury policy.  The Department of Risk Management would not object to this injury as being a LOD injury and authorize initial evaluation and medical treatment for this injury.   Plaintiff would see a city occupational health doctor and continued to see respective medical providers.  After

6

further evaluation, it was determined that the Plaintiff suffered torn ligaments and a fracture to his right dominate hand, and his hand was placed in a cast for 3 weeks.

20.    After informing the DFD Administration of his current restrictions and light duty status, plaintiff was informed by Administrative Captain, Gary Pierce, that he will be working for operations and to report to Chief Rand Wells, to assist with fire inspections for downtown firehouses. Mr. Pierce informed the Plaintiff that Mr. Wells would be his immediate supervisor while Plaintiff was on light duty. For the next 3 weeks, Plaintiff would assist downtown firehouses in conducting annual fire inspections. Plaintiff requested to do some of his own fire house inspections during this time. Without seeing a response to this request advising otherwise, Plaintiff's took the initiative to use the morning of 5 Apr 2019 to do some of his own firehouse inspections and then planned on later continuing to do the inspections he was working on the previous day.

21.    On 5 Apr 2019 at 1428 Plaintiff got a call from Administrative Lieutenant Jaime Markham to give him a call back. When the Plaintiff returned the call from Mr. Markham, Mr. Markham enquired about the Plaintiffs duties that day. Plaintiff informed Mr. Markham that he was doing some inspections for his own firehouse. Mr. Markham said nothing more and ended the call. On 5 Apr 2019 at 1530, Plaintiff received a second call from the Mr. Markham asking the Plaintiff to call him back. When Plaintiff returned this called, Mr. Markham instructed the Plaintiff to see him directly after the Plaintiffs doctor's appointment on the morning of 8 Apr 2019 when the Plaintiff was scheduled to get his cast removed off his right hand. Plaintiff enquired if this was urgent and asked if he could come down at that time and discuss whatever it was that Mr. Markham needed to talk to the Plaintiff about. Mr. Markham said no and that it will wait until after the Plaintiffs doctor's appointment on the morning of 8 Apr 2019.

22.    On the morning of 8 Apr 2019 before the Plaintiffs doctor appointment, Plaintiff reported to Mr. Markham enquiring about what it was Mr. Markham needed to talk to the Plaintiff

7

about.  Plaintiff wanted to go straight into doing inspections after his medical appointment that morning.  Mr. Markham informed the Plaintiff that it will wait until after the Plaintiffs doctor's appointment and to report back to him after the scheduled appointment.  Plaintiff then went to his doctor's appointment and got his cast removed where he remained on work restrictions which included "No use of right hand".

23.     After Plaintiffs appointment, Plaintiff reported back to Mr. Markham.  Instead of inquiring about the Plaintiffs hand and condition, Mr. Markham violated the Plaintiffs work restriction and initiated punishment in the order of having the Plaintiff hand right over 200 fire inspections that the Plaintiff had completed to date.  This order was to be done a custom inspection form that was created specifically for the Plaintiff.  This form was not by any other firefighter performing fire inspections because the DFD inspections were already being recorded digitally. This was a task no other firefighter ever had to do when completing inspections because they were all being tracked electronically on an iPad.  The order to hand write all the Plaintiff's completed inspection was a punishment for the Plaintiff doing fire inspections for his own firehouse.

24.     Instead of investigating this malicious action taken against the Plaintiff and supporting the Plaintiff in helping him recover from his LOD injury and the acerbation of his injury due to the punishment that was handed down to him, the City and its Departments would start on a path of discriminating events which would eventually lead up to the Plaintiff's termination of his position as a firefighter with the City.

25.     Instead of providing addition treatment for the acerbated injury to the Plaintiff's hand for having to hand right all his fire inspection, the City's Department of Risk management would delay the Plaintiff's physical therapy for another 3 months.  For the next 2 ½ months, Plaintiff remained assigned to the DFD's Operations Division doing firehouse inspections,  Plaintiff would

complete over (1200) inspections for the DFD, a task that no other firefighter was ever order to do, in that amount of time, solely on his own.

26.     On 20 June 2019, still suffering from nerve issues and pain symptoms from hand injury, Plaintiffs doctor determine that Plaintiffs injuries were more likely permanent, and any future therapy or treatment will only help with long term pain management.  Plaintiff would attempt to see if he could perform his duties in the firehouse under those conditions and was released to full duty without restrictions.

27.     After trying to attempt to perform his full duties as a firefighter, on 25 Sep 2019 Plaintiff was placed back on Light duty with restrictions of "*No user of Right hand, No driving on duty*."  Plaintiff was assigned Fire Prevent assisted personnel in their duties, a task that the Plaintiff has previous done and had working knowledge of.  After the Plaintiff was placed back on light duty, the DFD would begin to target the Plaintiff and begin a barrage of bias acts against the Plaintiff due to his medical condition.

28.     On 7 Oct 2019 Plaintiff was placed on a scanning project, where his primary task was to remove staples from filed documents.  This was a drastic change from his previous light duty tasks of supporting Fire Prevention, a position that the Plaintiff once held.  For the next two months, Plaintiff's sole duties was to pull staples each day for over 5+ hours a day.  When the Plaintiff brought up the fact that he was on restrictions with no use of his right hand, the DFD Administration instructed the Plaintiff to use his left hand in doing this task in efforts not to use his right hand and violate his work restriction again.  Plaintiff pointed out to the DFD that he is right hand dominate.  It was stated that the task is simple enough to do with his left so he would not have to use his right hand.

29.     On 17 Oct 2019, Plaintiffs work restriction on his right hand was changed from "*full restriction, no use of right hand*" to "*limited use of right hand as tolerated*".

9

30.     On 17 Oct 2019 Plaintiff would file an official complaint of discrimination with
CCRD against the DFD due to his medical condition and permanent injury to the Plaintiff's right
hand caused by the hand writing punishment the Plaintiff received earlier that year.

31.     In retaliation of Plaintiffs filed complaint with the Colorado Civil Right Division
(CCRD), on 21 Oct 2019 the City's Department of Risk Management would deny the Plaintiffs
worker compensation claim on grounds that they never received Plaintiffs past medial documents.
This denial of workers compensation ws done with Bias motives even though the Department of Risk
Management admitted compensability of the Plaintiff's workers compensation claim back in Mar
2019 and the Department of Risk Management never requested any additional medical documents
from the Plaintiff up until the day the Plaintiff filed his discrimination charge with the CCRD

32.     On 21 Oct 2019, Plaintiff had a COSH appointment, and it was then it was determined
his injury was permanent. It was advised by personal at the COSH clinic that the Plaintiff should file
for Long term disability with the city as well as with the FPPA disability.

33.     On 25 Nov 2019 Plaintiff sent an email to Administration Chief Wendy Moeder
request a meeting to discuss Plaintiffs medical condition and work status in the efforts to see if other
positions could be filled since Plaintiff's injury was deemed permanent and the task of pulling staples
began to have an effect on the Plaintiffs left hand from the repeated motion solely pulling staples for
over 5 hours a day. Plaintiff also was seeking advice on long term disability benefits and what is
needed to apply for them since Plaintiff was unfamiliar with this process.

34.     On 27 Nov 2019, Plaintiffs request to have a meeting was received and commented on
by Ms. Moeder that a meeting would be arranged but only later to be denied and no meeting ever
took place. Plaintiff would learn his application for Long Term Disability benefits were denied
because Plaintiff did not have this coverage afforded to him. Plaintiff was able to start the FPPA
disability application with the understanding this was standard procedure.

35.     On 5 Oct 2019, Plaintiff spoke with the DFD Admin about situation and discussed
continued pain in his left hand and requested a transfer to another light duty position.  Request was
denied saying "*there was no other light duty position available*" if thought light duty positions as a
chief's driver was available but granted to other firefighters on light duty and not to the Plaintiff.
Plaintiff would report to the City's Center for for Occupation Safety and Health (COSH) department
about the pain he was having in his left hand from pulling staples all day as his primary and only
work duty.  Plaintiff would be place on restrictions of not to continue performing his assigned work
duties.

36.     On 7 Nov 2019, Plaintiff had an informal interview with the officers at Fire Dispatch
looking at a possible position transfer at that time.  A week after, Plaintiff received a call from an
assistant with the FPPA informing Plaintiff that Mr. Pierce called the FPPA and informed them that
Plaintiff was seeking a position in Fire Dispatch.  The representative with FPPA informed Plaintiff
that he cannot receive a FPPA disability pension and still hold a support position in the DFD at the
same time.  Plaintiff inquired if he could rescind his FPPA disability application if there was an
opening within a support position.  The Plaintiff was informed he could if the DFD moved Plaintiff
into a support division, an act that the DFD has done to many injured firefighters in the past and still
has done to date.

37.     On 6 Dec 2019, Plaintiff reported to Mr. Markham and informed him of the Plaintiff's
current restrictions of limited use of right hand. Plaintiff requested another work assignment due to
the pain the Plaintiff was suffering in his left hand from pulling staples.  Mr. Markham told the
Plaintiff that there were no other light duty positions available and to report back to the Plaintiff
assigned duty position and continue his work tasks of pulling staples until advised otherwise.  This
was false as there was Chief driver positions available, which the DFD allowed other members with
more severe injuries to due.   Yet the DFD still instructed the Plaintiff to continue pulling staples

even after him complaining of initial symptoms of carpal tunnel due to the repetitive motion of doing the same daily tasks over and over gain for the last 2 months. Since the date the Plaintiff was assigned the task of solely removing staples, the Plaintiff would end up pulling over 1 ½ lbs of staples from doing this task over the past two months

38.    On 6 Dec 2019, Plaintiff would report to the Occupational Health clinic to seek preventative treatment for carpal tunnel and medication for the pain symptoms he was having in his left hand resulting from the work task of pulling staples.

39.    On 9 Dec 2019, instead of assisting the Plaintiff with work duties that would accommodate the injures that the DFD caused him, the DFD and the City would place the Plaintiff on LWOP. Plaintiff reached out to the Local 858 to file a grievance about the work conditions the Plaintiff was dealing with but the Local denied the Plaintiff's request and didn't provide any assistance or guidance regarding his condition of being on LWOP or how the Plaintiff could resume working duties with the DFD to begin receiving pay and medical benefits again.

40.    Being placed on LWOP caused enormous financial strain for Plaintiff, who was the primary source of income for his household and medical benefits were provided to the Plaintiffs family through his employment with the City. DFD kept Plaintiff on LWOP even after 19 Dec 2019, when Plaintiff's restrictions were removed on his left hand and Plaintiff's was cleared for "*full duty, no restrictio*ns" and still had "*limited use of right hand as tolerated*". Plaintiff could have performed many tasks and duties that other firefighters were doing in their assigned roles but yet the DFD denied those opportunities to him. DFD always had access to Plaintiff's current work restriction status from the COSH clinic, so they had notice that Plaintiff's work restrictions on his left hand were lifted and Plaintiff could perform duties in a support position.

41.    While on LWOP, Plaintiff made several requests to DFD administration to return to work and to be reassigned to a support position wherein he could perform all essential functions of

12

the position even within his LOD injury work restrictions with reasonable accommodations. He also requested a hardship transfer. All of these requests were denied by DFD.

42.　　On 8 Jan 2020, after Plaintiff wrote a letter directly to the Chief of Department requesting to return to work duties, Ms. Moeder emailed Plaintiff, "*you have not been released to return to work with no restrictions, and your current restrictions do not allow you to perform the functions of your position as a firefighter.*" However, Plaintiff's work restrictions for his left hand were already removed on 19 Dec 2019, and Plaintiff could use his right hand to perform support division duties in Fire Prevention or in Fire Dispatch. All updates to Plaintiff's ongoing medical status were received, logged, and tracked by DFD administration.

43.　　On 21 January 2020, after being on LWOP for nearly a month, Plaintiff had no choice but to apply for public assistance through the Jefferson County Human Service office, an action that was humiliating to the Plaintiff knowing the reason was due to actions taking against him in which the Plaintiff had no control over. However, since Plaintiff still showed he was employed with the Defendants, Plaintiff could not receive any financial or family assistance to offset the loss in pay and support the growing financial needs of his family.

44.　　On 24 Jan 2020, the City Human Resource office, initiated the Interactive Process (IAP) to assist the Plaintiff in finding another position within the City as required by law under the ADA.

45.　　Given that the DFD continued to refuse to allow Plaintiff to return to work despite him having no work restrictions on his left hand, and limited use of his right hand, Plaintiff believed in good faith that his only recourse would be to continue with the FPPA. The FPPA instructed Plaintiff if a disability decision was awarded in the Plaintiffs favor, he would be unable to receive benefits while still employed with the City as a Firefighter. The FPPA informed the Plaintiff his award of

13

disability could be deferred to any date that the City set based off employment actions the City and the Plaintiff was undergoing while the Plaintiff's job title remained a Firefighter.

46.    On 27 Jan 2020 Plaintiff met with the City Human Resource office to make a formal complaint of discrimination regarding the actions taken by the DFD towards the Plaintiff. Nothing came of this meeting to give weight that the City had any interesting in investigation the hostile work environment the Plaintiff found himself in nor investigate the continued discriminatory acts the DFD and Department of Risk Management and its officials were taking part in against the Plaintiff.

47.    On 5 Feb 202, Plaintiff received notice that the City scheduled an Independent Medical Evaluation (IME) for 5 Mar 2020 in regards to the Plaintiffs LOD injury and denied Workers Compensation claim by the City's Department of Risk Management.

48.    On 24 Feb 2020, Plaintiff met with a representative from the Local 858 and personnel from the Public Safety Human Resources (HR) office to give an in-person statement of the working conditions the Plaintiff was subject too and the unjust actions taken by the DFD and the Department of Risk Management. Not one supporting action was taking toward the supporting the Plaintiff by the Local 858 or the Public Safety HR office in efforts to address the adverse employment actions taken against the Plaintiff regarding the violation of the Plaintiffs work restrictions, the delay and then denial of the Plaintiffs Worker Compensation claim and then the Plaintiff being placed on LWOP.

49.    On 25 Feb 2020, the City's Department of Risk Management canceled the scheduled IME because of their access to the 3 separate independent Medical Evaluations (IME) conducted by the FPPA and his disability application. All 3 IMEs indicated the Plaintiff's injury to his right hand was a LOD injury and that Plaintiff did suffer from nerve damage preventing him from performing his duties as a firefighter.

50.    On 28 Feb 2020, Plaintiff received notice of temporary disability benefits from the FPPA which his benefits should have started on that date. The FPPA would communicate with the City in a request from the Plaintiff to push back his benefits date so the Plaintiff could receive medical coverage for his family for the month of March 2020. Plaintiff had several shift scheduled through the month of March which other firefighters were willing to work since Plaintiff could not perform his duties as a firefighter. Plaintiff was informed by the FPPA that his employment would end at midnight on 3 Mar 2020 after his first scheduled work shift that month and that the DFD removed the remaining work trades the Plaintiff had scheduled.

51.    On 2 March 2020, Plaintiff received an IAP Conclusion Letter which stated in part, "*Since your request for FPPA Disability retirement has been approved effective 02/26/2020, this will conclude the Interactive Process. Please be advised that March 2, 2020 will be your last day with the City and County of Denver according to the rules and regulations under the FPPA policy.*" The rules and regulations of the FPPA policy states that Plaintiff could not receive benefits as long as he was in a position performing duties as a firefighter. The IAP process could have continued through the 90 days required under law but the City chose not to do so. The City terminated the Plaintiff's employment prematurely and did not allow the Plaintiff to take the full 90 days to complete the IAP process. Plaintiff remained on LWOP and other firefighter were working shift trades for the Plaintiff during the initial part of the IAP process so his FPPA disability could continue to be deferred until the IAP process concluded. The City employs several members that recieve FPPA disability retirement so this decision should not have been grounds for the City to terminate the employment of the Plaintiff.

52.    Plaintiff would never recover from his hand injury. Rather than working to provide Plaintiff with a reasonable accommodation for his disabilities, the Defendants then used Plaintiff's disability against him to find Plaintiff unfit for duty. At Midnight of 3 Mar 2020, Plaintiff's

15

employment was terminated by the City as the FPPA placed the Plaintiff in a temporary disability

status on 26 Feb 2020 due to his LOD injury.  Plaintiff was forced into a medical retirement as a

Firefighter due to the DFD violating the Plaintiffs work restriction and acerbating the injury to his

right hand, but this did not disqualify the Plaintiff from working in any other capacity within the City

and looking for other open position if the IAP process had continued.  The IAP conclusion letter

gives proof that the City denied the rights for the Plaintiff to find alternative work positions with the

City which is as outlined under the City's Office of Human Resources ADA IAP reassignment

process policy.

  53. On 31 August 2020, after 9 months of on-duty and 7 months of off-duty continuous

therapy and treatment to Plaintiff's right hand in an effort to return to full duty, the FPPA updated

Plaintiff's disability status from Temporary Occupational Disability to a Permanent Occupational

Disability.

  54. This disability status and Plaintiff's ongoing LOD injury has prevented him from

reenlisting into the Marine Corps Reserves, denying him the ability to continue his honorable military

service. Plaintiff's disability, caused by and further worsened by DFD's deliberate act of violating his

work restriction and delaying his medical treatment, is a disqualifying medical condition for

enlistment as outlined under the Department of Defense, Medical Standards for Military Service.

  55. The City would continue their continuous core campaign of bad faith, deception and

deflection, by rescheduling another IME for 27 Apr 2021, over a year after the termination date of the

Plaintiff.  The City would have the Plaintiff travel to Colorado Springs to see an Independent medical

doctor to complete this IME.  The total distance was 160 miles and took over 4 hrs of travel to make

this appointment.  It was not until 22 Apr 2022 that an offer was given by the City to settle the

Workers Compensation claim after the City's independent IME conducted on 22 Apr 2021 gave

weight that the injury suffer by the Plaintiff nearly 3 years from that date was actually a LOD injury.

Plaintiff was informed that the charges brought forth in this claim could not be filed under the laws

governing a workers compensation claim and that a civil claim would have to be filed to address

these unlawful acts.

COUNT 1

CIVIL CONSPIRACY AGAINST The CITY and the Union

In Pursuant to 42 U.S.C. § 1985 (2012) & C.R.S. §18-2-201

56.    For the plaintiff, to recover from the defendant on a claim of civil conspiracy, claim

must find that all of the following have been proved by a preponderance of the evidence:

      I.     The defendant(s) (and at least one other person) agreed, by words or conduct, to (accomplish an unlawful goal) (or) (accomplish a goal through unlawful means);

      II.    One or more unlawful acts were performed to accomplish the goal) (or) (one or more acts were performed to accomplish the unlawful goal);

      III.   The plaintiff had (injuries) (damages) (losses); and

      IV.   The plaintiff's (injuries) (damages) (losses) were caused by the acts performed to accomplish the goal.

57.    Plaintiff filed a Workers Compensation Claim after sustaining a Line-of-Duty injury

to his right hand on 13 Mar 2019. The City had 20 days to deny or accept this claim. The City

would accept this claim and allow Plaintiff ability to get evaluated by several specialty doctors. On 8

Apr 2019 the DFD administration would deliberately orchestrate a punishment that would ultimately

cause a permanent debilitating injury to the Plaintiff; an injury that the Plaintiff should have had a

full recovery. The City and its Departments would conspire together to delay then deny the Plaintiffs

workers compensation claim. Together the City and its Departments would ignore several requests

for work accommodations, ignore requests for guidance on how to get treatment for work related

medical condition or what resources the Plaintiff had for his LOD injury.

58.    As a self-ensured insurance policy holder, the City's Department of Risk

Management, a separate department on the City, would deny the Plaintiffs Workers compensation

claim after the Plaintiff filed a complaint against the DFD with the CCRD. The DFD and the City

17

would conspire and claim that they could not find any working positions that the Plaintiff could work in due to his work related injuries that was caused by the malicious actions of the DFD.

59.     The local 858 would conspire with the City and ignore the Plaintiffs complaints even though he was a due paying member.  When the Plaintiff reached out to the Local 858, the Union President, David Foster mentioned that the Local 858 and the City had discussed the current working condition and medical status of the Plaintiff.  The union has an obligation to support a union member when it comes to violations of written departmental rules and regulations, and policies and procedures manual(s) governing personnel practices or working conditions between the City and its Union Members. Instead of further investigating the claims made by the Plaintiff and his request to file a grievance, the Local 858 colluded with the City and ignored the Plaintiffs request for representation with his claims and supported the actions of the City and its Departments in their efforts to find the Plaintiff unfit for duty.

60.     When the Plaintiff reached out to the Department of Safety HR they too ignored the Plaintiffs request for investigation into his claims.   The City would then end the Interactive Process in relocation of the Plaintiff to another work position within the City as required by law.  There were several position open that the Plaintiff could fill without accommodations from his LOD injury.

61.     The City's Department of Public Safety HR would continue to ignore the complaints made by the Plaintiff towards the acts taken by the DFD and the City's Department of Risk Management only to provide further proof that the City and its respective departments colluded with each other to burden the Plaintiff ultimately terminating his employment and denying necessary medical treatment for his Line-of-Duty injury.  The Department of Safety HR supported the action of terminating the employment of the Plaintiff due to his medical condition caused by the bias actions taken by the DFD and ultimately delaying and denying necessary treatment for the LOD injury the Plaintiff suffered while employed with the City.

62.    As a result of such violation, the Plaintiff is entitled to damages that a trial court may

deem compensating for such violations including without limitation other not mentioned

compensation that may be permissible, as well as reasonable attorneys' fees and court costs as

applicable.

**COUNT 2**
**BAD FAITH BREACH OF INSURANCE CONTRACT**
(FIRST-PARTY COMMON-LAW CLAIMS AGAINST The CITY)
In Pursuant to C.R.S. § 10-3

63.    For the plaintiff, to recover from the City a Bad Faith Breach of Insurance Contract,

First Party Common Law Claim, the court would have to find all the following have been proved by

a preponderance of the evidence:

I.     The plaintiff had (injuries) (damages) (losses);
II.    The defendant acted unreasonably in (insert appropriate description, e.g.,
       "denying payment of the plaintiff's claim");
III.   The defendant knew that its (conduct) (position) was unreasonable or the
       defendant recklessly disregarded the fact that (his) (her) (its) (conduct)
       (position) was unreasonable; and
IV.    The defendant's unreasonable (conduct) (position) was a cause of the
       plaintiff's (injuries) (damages) (losses).

64.    The Plaintiff suffer a Line-of-Duty injury while performing his duties as a Firefighter

with the DFD when employed with the City.  Plaintiff filed a Workers Compensation Claim in which

the City had 20 days to deny or accept this claim.  The City would accept this claim and allow

Plaintiff ability to get evaluated by several specialty doctors.  The City would retaliate against the

Plaintiff after the Plaintiff filed a claim against the DFD with the CCRD for discrimination, a legal

right the Plaintiff has without retaliation.

65.    This claim was from the DFD violating the Plaintiffs work restriction by handing

down a punishment which cause the Plaintiff to sustain a permanent injury.  The City would deny the

Plaintiffs Workers Compensation claim after his filing, after the Department of Risk Management

admitted compensability.  The City claims they did not receive medical release documents giving

authorization to gather information pertaining to Plaintiff's claim yet the City never requested these documents until 220 after the Plaintiffs initial injury.

66.     When the Plaintiff provided the medical release documents to the City, the City continued to deny the Plaintiffs Workers Compensation claim without valid reason. Plaintiff had several Independent Medical Evaluation by several doctors to include the City's own medical doctor stating this injury was a Line-of Duty Injury. The Plaintiff would be denied needed medical treatment and medication for his Line-of-Duty injury. Plaintiff would have to pay for follow-on treatment and medical care at his own expense.

67.     As a result of such violation, the Plaintiff is entitled to damages that a trial court may deem compensating for such violations including without limitation other not mentioned compensation that may be permissible, as well as reasonable attorneys' fees and court costs as applicable.

**COUNT 3**
**BAD FAITH BREACH OF INSURANCE CONTRACT**
(UNREASONABLE CONDUCT/UNREASONABLE POSITION AGAINST The CITY)
In Pursuant to C.R.S. § 10-3

68. For the plaintiff, to recover from the City a Bad Faith Breach of Insurance Contract, Unreasonable Conduct/Unreasonable Position claim, determining whether the defendant acted unreasonably in (denying) (or) (delaying) payment if you find that:

I.      The defendant willfully engaged in such conduct;
II.     Such conduct caused or contributed to the defendant's (denial) (or) (delay) of payment of the plaintiff's insurance claim; and
III.    Such conduct caused or contributed to any of the plaintiff's claimed (injuries) (damages) (losses)

69.     Because the City is self-insured, they have the ability to converse with other agency within the City not giving the best interest of a Plaintiff. In a common situation where an employee is injured at work, it would be in the best interest of the employer that the injured employee gets

immediate and necessary treatment to return to work, in which the Insurance company would pay out

through a Workers Compensation Claim.  It is also in the best interest of the insurance company that

the work restrictions of an injured employee adhered to and that the injured employee meets and

fallows all required guidelines handed down during their recovery to return to work as soon as

possible and not bring undue medical expenses to the insurance company.

70.     In this claim, the City controlled both sides of the claim.  Instead of looking out for the

injured Plaintiff, the City and its Departments would work together to weaponize the Workers

Compensation Claim process and use it against the Plaintiff.  No one was looking out for the best

interest of the injured Plaintiff.  The DFD abused the Plaintiffs work restrictions and the self-insured

City would later deny the Plaintiff's Workers Compensation Claim ultimately using the system to

support the termination of the Plaintiffs employment with the City.

71.     As a result of such violation, the Plaintiff is entitled to damages that a trial court may

deem compensating for such violations including without limitation other not mentioned

compensation that may be permissible, as well as reasonable attorneys' fees and court costs as

applicable.

**COUNT 4**
**BAD FAITH BREACH OF INSURANCE CONTRACT**
(FIRST-PARTY STATUTORY CLAIMS AGAINST The CITY)
In Pursuant to C.R.S.  § 10-3

72.     For the plaintiff, to recover from the defendant, a claim of unreasonable (denial of)

(delay in) payment of benefits, the claim must find all the following have been proved by a

preponderance of the evidence:

> I.     The defendant (denied) (delayed) payment of benefits to the plaintiff; and
> II.    The defendant's (denial) (delay) of payment was without a reasonable basis.

73.     Plaintiff suffered a Line-of Duty injury on 13 Mar 2019.  Plaintiff filed a Workers

Compensation Claim in which the City had 20 days to deny or accept this claim.  The City would

accept this claim and allow Plaintiff ability to get evaluated by several specialty doctors.  The DFD

would exacerbate the Plaintiffs injury when they violated his work restriction in ordering the Plaintiff

to hand write over 200 inspections to account for the Plaintiffs work duties even thought the

inspections were already being record digitally on an iPad.

74.     The city would then delay the Plaintiffs physical therapy for another 3 months.  The

City would later retaliate against the Plaintiff after the Plaintiff filed a claim against the DFD with the

CCRD for discrimination, a legal right the Plaintiff has without retaliation.  The City would deny the

Plaintiffs Workers Compensation claim, beyond the 20 days given under federal law and after the

Department of Risk Management admitted compensability and prevent the Plaintiff from receiving

necessary medical treatment for his work related injury.

75.     As a result of such violation, the Plaintiff is entitled to damages that a trial court may

deem compensating for such violations including without limitation other not mentioned

compensation that may be permissible, as well as reasonable attorneys' fees and court costs as

applicable.

**COUNT 5**
**BAD FAITH BREACH OF INSURANCE CONTRACT**
In Pursuant to C.R.S.  § 10-3
(UNREASONABLE DELAY OR DENIAL AGAINST The City)

76.     An insurer's delay or denial in authorizing payment of a covered benefit is

unreasonable if that action is without a reasonable basis.

77.     Plaintiff suffered a Line-of Duty injury on 13 Mar 2019.  Plaintiff filed a Workers

Compensation Claim in which the City's Department of Risk Management had 20 days to deny or

accept this claim.  The City would accept this claim and allow Plaintiff ability to get evaluated by

22

several specialty doctors. The DFD would exacerbate the Plaintiffs injury when they violated his

work restriction in ordering the Plaintiff to hand write over 200 inspections to account for the

Plaintiffs work duties even though the inspections were already being record digitally on an iPad.

The city would then delay the Plaintiffs physical therapy for another 3 months.

78.     The City would later retaliate against the Plaintiff after the Plaintiff filed a claim

against the DFD with the CCRD for discrimination, a legal right the Plaintiff has without retaliation.

The City would deny the Plaintiffs Workers Compensation claim, beyond the 20 days given under

federal law and after the Department of Risk Management admitted compensability and prevent the

Plaintiff from receiving necessary medical treatment for his work-related injury.   This continued for

over 2 years after the City's Department of Risk Management wrongfully denying the Plaintiff's

worker compensation with out due cause.

79.     As a result of such violation, the Plaintiff is entitled to damages that a trial court may

deem compensating for such violations including without limitation other not mentioned

compensation that may be permissible, as well as reasonable attorneys' fees and court costs as

applicable.

**COUNT 6**
**BAD FAITH BREACH OF INSURANCE CONTRACT**
In Pursuant to C.R.S. § 10-3
(RECKLESS DISREGARD AGAINST The City)

80.     An insurance company recklessly disregards the unreasonableness of its (conduct)

(position) when it (acts) (takes a position) with knowledge of facts that indicate that its (conduct)

(position) lacks a reasonable basis or when it is deliberately indifferent to information concerning the

claim.

81.     Plaintiff filed a Workers Compensation Claim after sustaining a Line-of-Duty injury

to his right hand on 13 Mar 2019. The City had 20 days to deny or accept this claim. The City

would accept this claim and allow Plaintiff ability to get evaluated by several specialty doctors.  The

City also had the ability to request any additional medical history documents from the Plaintiff but

failed to do so.   The City would later deny the Plaintiffs Workers Compensation claim, beyond the

20 days given under federal law and after the Department of Risk Management admitted

compensability.

82.    The denial of the Plaintiffs Workers Compensation Claim preventing the Plaintiff

from receiving necessary medical treatment for his work-related injury.  The City's Department of

Risk Management would claim they never received a medical release from the Plaintiff.  The City

never asked for these documents from the Plaintiff after his initial workers compensation claim.

Plaintiff would provide the City with all necessary and required documents when asked and the City

continued to deny the Plaintiffs workers compensation claim and preventing the Plaintiff from

receiving needed medical treatment for his work related injury which he is entitled to under federal

and state law.

83.    As a result of such violation, the Plaintiff is entitled to damages that a trial court may

deem compensating for such violations including without limitation other not mentioned

compensation that may be permissible, as well as reasonable attorneys' fees and court costs as

applicable.

**COUNT 7**
**BAD FAITH BREACH OF INSURANCE CONTRACT**
(DUTY OF GOOD FAITH AND FAIR DEALING AGAINST The City)
In Pursuant to C.R.S. § 10-3

84.    An insurance company owes to those it insures the duty of good faith and fair dealing.

That duty is breached if the company unreasonably delays payment, denies payment, fails to

communicate promptly and effectively, insert description of other conduct or position that may

constitute bad faith breach of insurance contract, and the company knows that its delay, and/or denial

insert description of other conduct or position that may constitute bad faith breach of insurance
contract is unreasonable or it recklessly disregards whether its conduct position is unreasonable.

85.     Plaintiff filed a Workers Compensation Claim after sustaining a Line-of-Duty injury
to his right hand on 13 Mar 2019. The City had 20 days to deny or accept this claim. The City
would accept this claim and allow Plaintiff ability to get evaluated by several specialty doctors. The
city would delay the Plaintiffs physical rehab for 3 months after they violated his work restriction and
acerbated his original LOD injury. The City would later deny the Plaintiffs Workers Compensation
claim, beyond the 20 days given under federal law and after the Department of Risk Management
admitted compensability. The denial of the Plaintiffs Workers Compensation Claim preventing the
Plaintiff from receiving necessary medical treatment for his work-related injury. Plaintiff provided
the City with all necessary and required documents when required and the City continued to prevent
the Plaintiff from receiving needed medical treatment which he is entitled to under federal and state
law.

86.     As a result of such violation, the Plaintiff is entitled to damages that a trial court may
deem compensating for such violations including without limitation other not mentioned
compensation that may be permissible, as well as reasonable attorneys' fees and court costs as
applicable.

COUNT 8
BREACH OF CONTRACT AGAINST The City
In Pursuant to C.R.S. § 8-3-108 (2016)

87.     For the plaintiff, to recover from the defendant, on a claim of breach of contract, the
claim must find (all) (both) of the following have been proved by a preponderance of the evidence:

        I.     The defendant entered into a contract with the plaintiff; and,
        II.    The defendant failed to obey by their own directives, policies and procedures;
             and,
        III.   The plaintiff substantially performed and complied with his part of the
             contract.

25

88.    Colorado recognizes that every contract contains an implied duty of good faith and

fair dealing. Plaintiff was hired by the City as a full-time paid firefighter with the DFD on 1 Dec

2006. In accepting this role, the Plaintiff agreed to provide a duty and service as a Firefighter and

First Responder to those that live in, work in and/or visit the City and County of Denver. In return,

the DFD provided full-time pay and benefits to the Plaintiff until his placement on LWOP, 3 months

before he employment was terminated. The DFD also provided directives and guidelines that the

DFD would adhere to, the Plaintiff would adhere to and the City would support.

89.    The DFD Directives would include but not limited to: Hazing, Harassment

Retribution; Disciplinary Guidebook; Code of Conduct; Corrective Action Procedures. The DFD

violated these contractual obligations when the DFD allowed the punishment to be handed down to

the Plaintiff on 8 Apr 2019 and continuing to put him in a hostile work environment. The DFD

claims this punishment was due to the Plaintiff disobeying a direct order, yet the DFD failed to

follow its own Disciplinary Guidebook and did not afford the Plaintiff due process.

90.    There is no formal recording of this action because the DFD failed to follow its on

Directives. This action also violated the Corrective Action Procedure Directive as well as the DFD

Directive outlining the Code of Conduct which includes language of: "*MEMBERS SHALL NOT:*

*Engage in a conflict of interest to the department or use their position with the Department for*

*personal gain or influence*" or "*MEMBERS SHALL NOT: Engage in intimidating, threatening, or*

*hostile behaviors, physical assault, or other acts of this nature.*" The Plaintiff was handed down a

punishment and now has a career ending, debilitating injury.

91.    As an employed Firefighter with the City, the City would also have commission rules

that they would adhere to with an employee which includes but not limited to: Rule 11- Reduction in

Force, Leave of Absence, Resignation, Reemployment, Return to Duty and Rule 12 - Disqualification

and Disciplinary Appeals, Hearings and Procedures. If the DFD deemed at any time that the Plaintiff disobeyed an order or his conduct was in question, the DFD and the City would have to follow the guidance found under Section 2 (Departmental Disciplinary Procedures) of Rule 12 of the City and County Commission Rules, which never happened. This section states: "*Any Member of the Classified Service in the Fire and Police Departments shall be subject to verbal or written reprimand, fine, suspension with or without pay, reduction in grade and/or rank, and/or discharge for a violation of the departmental rules and regulations.* "

92.    The City may also argue that the Plaintiff gave notice of his intent to resign, and his employment was not terminated. The City will fail to show proof of this action by the Plaintiff because in Section 3 (Resignation), Rule 11of the City and County Commission Rules, it states "*A member wishing to resign shall submit a resignation in writing to the Manager of Safety and the Chief of the department together with a copy to be forwarded to the Commission, giving the date the resignation is to become effective and the reason for the resignation.*" Plaintiff never gave such notice and had full intention of using the IAP to find another position within the City to maintain employment. The City violated many of its own departmental rule, department regulations, directives, policies and procedures which directly and adversely affected the Plaintiff's pay, physical and mental health, and overall employment with the City.

93.    As a result of such violation, the Plaintiff is entitled to damages that a trial court may deem compensating for such violations including without limitation other not mentioned compensation that may be permissible, as well as reasonable attorneys' fees and court costs as applicable.

COUNT 9
BREACH OF CONTRACT AGAINST The LOCAL 858
In Pursuant to C.R.S. § 8-3-104

94.    For the plaintiff, to recover from the defendant, on a claim of breach of contract, the

claim must find (all) (both) of the following have been proved by a preponderance of the evidence:

> I.    The defendant entered into a contract with the plaintiff as a member of its
> Union; and
> II.    The defendant failed to support the Plaintiff with his request to file a grievance
> against the city; (and)
> III.    The plaintiff substantially performed his part of the contract by paying his
> monthly dues to the Union.

95.    Colorado recognizes that every contract contains an implied duty of good faith and

fair dealing. Plaintiff was hired by the City as a full-time paid firefighter with the DFD on 1 Dec

2006 and was a Union Due paying member since that date. As a due paying member, contractually

the Local 858 owes a duty of fair representation to the Plaintiff and all the employees it represents

when pursuing a worker's grievance. The Local failed to investigate and take action in regard to the

grievance the Plaintiff wanted to make against the DFD and the City. A grievance is a complaint by

union member concerning the application or interpretation of the specific provisions of a current

Memorandum of Understating "MOU", the Personnel Ordinance, Salary Resolution, written

departmental rules and regulations, and policies and procedures manual(s) governing personnel

practices or working conditions between the City, the DFD and its employees.

96.    The Union President at the time, David Foster stated that the Plaintiffs claim was a

work-related injury and did not adhere to the condition in which a grievance could be filed under the

current MOU made between the Local 858 and the City. Mr. Foster ignored the fact the injury to the

Plaintiff's right hand was acerbated by the punishment handed down to him by the DFD

Administration. This violated the DFD and the City's policies and procedures in the ensure a

member would work in a safe workplace. The second injury to the Plaintiff's left hand was due to

the degrading duty assignment of puling staples out of paper for over 2 months which can also be

argued of violating the DFD and the City's policies and procedures. The Union had a duty to the

28

Plaintiff to ensure all personnel ordinance, salary resolution, written departmental rules and regulations, and policies and procedures manual(s) governing personnel practices or working conditions between the City, the DFD and its employees were adhered too. The Local 858 failed the Plaintiff with allowing the City to violate many of its own departmental rule, department regulations, directives, policies and procedures which directly and adversely affected the Plaintiff's pay, physical and mental health, and overall employment with the City.

97.    As a result of such violation, the Plaintiff is entitled to damages that a trial court may deem compensating for such violations including without limitation other not mentioned compensation that may be permissible, as well as reasonable attorneys' fees and court costs as applicable.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor against Defendants and order the following relief as allowed by law:

A.    Compensatory damages, including but not limited to those for emotional distress, inconvenience, medical anguish, and loss of enjoyment of life;

B.    Punitive damages as applicable;

C.    Back pay of medical benefits and payments as applicable;

D.    Front pay of medical benefits and payments as applicable;

E.    Repayment of dues and payments as applicable;

F.    Attorneys' fees and costs of this action as permitted by law;

G.    Pre-judgment and post-judgment interest; and

H.    Such further relief as this Court deems just and proper.

JURY TRIAL DEMAND

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.

29

Dated this 23rd day of February 2023.

Respectfully submitted

David Perez
Pro Se Plaintiff

(303) 422 2702
David.Perez@1203Media.com

Address of Plaintiff

619 12th St   # 348
Golden Colorado 80401

Dated this 23rd day of February 2023.

Respectfully submitted.


David Perez
Pro Se Plaintiff

(303) 422 2702
David.Perez@1203Media.com


Address of Plaintiff

619 12th St   # 348
Golden Colorado 80401

30